AO 106 (Rev. 04/10) Application for a Search Warrant

AUSAs Kim/Martinez

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The Cellular Telephone Assigned Call Number 740-319-7993

Case No. 2:18 mj 521

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1503 | Obstruction of justice |
| 18 U.S.C. 1512 | Witness tampering/obstruction of justice |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Michael A. Harey, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 16, 2018

*Judge's signature*

City and state: Columbus, Ohio

Elizabeth A. Preston-Deavers, U.S. Magistrate Judge
*Printed name and title*

CSS

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER<br><br>**740-319-7993 (Sprint)** | **2:18 mj 521**<br><br>Misc. No. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Michael A. Harey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **740-319-7993 (Sprint) (TARGET PHONE)** that is stored at premises controlled by **Sprint** wireless telephone service provider, headquartered at **Sprint 6480 Sprint Pkwy Overland Park, Kansas 66251**. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require **Sprint** to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since October 2008. I have been employed by the FBI for 9 years. I am currently assigned to Squad 17, having worked public corruption for the past two years. During this time, I have worked on numerous public corruption investigations in which cellular telephones were used to

engage in criminal activity. Prior to working public corruption, I worked on the Joint Terrorism Task Force (JTTF) in Columbus, Ohio for approximately seven years. During my time on the JTTF, I worked on numerous terrorism cases in which the use of cellular telephones was prevalent.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that obstruction of justice has occurred within the meaning of 18 U.S.C. §§ 1503 and/or 1512, and that such crimes have been committed, are being committed, and will be committed by suspects both known and unknown. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes as further described in Attachment B.

## PROBABLE CAUSE

5. The United States government, FBI and IRS are investigating allegations of fraud involving Jason ADKINS and others known and unknown to the investigation. The investigation concerns possible violations by ADKINS and others regarding a Ponzi-scheme fraud involving approximately $50 million, and implicates violations of 18 U.S.C. §§ 1342, 1343, 1956 and 1957. The investigation into ADKINS has resulted in Gregory BARNES being the target of an investigation for witness tampering and obstructive conduct. BARNES, while working as an informant for the FBI, tipped ADKINS off as to the investigation against

2

ADKINS, and thereby obstructed the ADKINS Investigation. The BARNES investigation is the purpose for which this search warrant is being sought.

6. BARNES has been operating as a paid informant for the FBI for almost two years. On or about October 19, 2016, BARNES was activated as an informant, and was later tasked with interacting with ADKINS in a covert capacity to gain potential information into ADKINS' fraud. As explained further below, in late February 2017, despite being tasked to covertly collect information for the FBI, BARNES actually notified ADKINS he was under investigation. This was the first instance of obstructive behavior by BARNES.

### Adkins' home is searched on March 1, 2018; Adkins tells law enforcement that Barnes attempted to bribe him in February 2017.

7. On March 1, 2018, a search warrant authorized by this Court (and currently still under seal) was executed by law enforcement agents at ADKINS' home. During the execution of the search warrant, ADKINS was interviewed by agents who identified themselves and talked to ADKINS about the purpose for which the warrant was being executed. During the interview at his home, and in subsequent interviews, ADKINS made admissions as to his fraudulent activity. It was during this initial interview of ADKINS that agents first learned of BARNES' obstructive behavior.

8. After the initial search warrant and interview, ADKINS secured an attorney, singed a proffer letter and began cooperating with the government. ADKINS has participated in multiple proffers with the FBI, IRS, and the United States Attorney's Office for the Southern District of Ohio. During the first interview of ADKINS at the scene of the search of his home, and in subsequent proffer interviews, agents learned the following:

   a. Prior to the search warrant being executed, and while the investigation of this case was still ongoing, BARNES advised ADKINS that there was a federal investigation into

3

ADKINS. Barnes then attempted to solicit a bribe of $200,000 from ADKINS, in return for which BARNES proposed that he would facilitate the closure of ADKINS' investigation by making it "go away." ADKINS' attorney advised ADKINS against any payment that could be seen as a bribe payment. As a result of this, ADKINS eventually stopped talking with BARNES. This information was provided by ADKINS and corroborated by his then attorney.

c.  ADKINS' attorney at the time recalled that, on or about February 17, 2017, ADKINS sent the attorney a screenshot of BARNES' phone contact information entry from ADKINS' phone. The entry was labeled "GREGORY BARNES." On or about March 22, 2018, ADKINS' then attorney provided agents and prosecutors with a screenshot of BARNES' phone contact from ADKINS' phone that ADKINS sent to the attorney on or about February 17, 2017, when the BARNES solicitation occurred. Agents thus believe the bribe occurred during the mid- to late February 2017 timeframe.

d.  BARNES met with ADKINS two times at ADKINS' home between November of 2016 and February of 2017. The second of the two meetings was the above-described unauthorized visit to ADKINS' home in mid- to late February of 2017. During this above-described obstructive visit to ADKINS' home in early 2017, it is important to note that BARNES was only tasked by the FBI to meet with ADKINS at ADKINS' home on one occasion, meaning that any such second meeting was unauthorized.

9.  The FBI believes BARNES had the TARGET PHONE with him when he engaged ADKINS in the untasked meeting in February 2017. Agents believe this because BARNES was known to have the TARGET PHONE on his possession during FBI directed interactions with ADKINS. For instance, on or about November 16, 2016, BARNES was known

4

by the FBI to have exchanged text messages with ADKINS' phone number leading up to the only FBI-tasked meeting with ADKINS at ADKINS' residence in Jackson, Ohio that occurred on November 22, 2016. On November 21, 2016, the FBI knew BARNES to have had telephonic contact with ADKINS to set up the in-person meeting between BARNES and ADKINS at ADKINS' home on November 22, 2016. Later on the same day, November 21, 2016, the FBI knew BARNES to have exchanged text messages with ADKINS, which included ADKINS providing BARNES with his address in Jackson, Ohio in order to finalize the meeting at ADKINS' home.

10. Agents believe cell-site locator information from BARNES' cell phone activity during the known and FBI-directed meeting between BARNES and ADKINS that occurred on November 22, 2016, when compared to the cell-site locator information regarding the late-February 2017 meeting (when the alleged obstructive activity occurred), will corroborate information obtained by agents and allegations made by ADKINS that BARNES did indeed attempt to solicit a bribe from ADKINS in exchange for obstructing the FBI investigation into ADKINS in late February 2017.

**Adkins cooperates with the government; places recorded call to Barnes on May 29, 2018; and then sets up meeting with Barnes on May 30, 2018.**

11. On May 29, 2018, under the direction of the FBI, ADKINS placed a consensually recorded call to BARNES asking for a meeting at ADKINS' home.

12. Prior to the recorded meeting on May 29, 2018, and prior to another meeting between BARNES and ADKINS that took place a day later, on May 30, 2018, law enforcement obtained information that tends to corroborate ADKINS' allegations.

13. After ADKINS' recorded call to BARNES on May 29, 2018, but before their face-to-face meeting on May 30, 2018, BARNES contacted federal agents working on this case

and indicated that ADKINS wanted to meet with him. During a meeting with agents, BARNES posited what he thought might be the reason for ADKINS's request for a meeting: ADKINS, BARNES explained, might want BARNES to use BARNES' connections to the mob who have blood relatives in the federal government and who can "find stuff out." Prior to this meeting with agents, however, BARNES had never told agents that he informed ADKINS that he had mob connections with access to government information. This was also not a strategy that would have benefited the investigation into ADKINS. Instead of what BARNES tried to tell law enforcement as to the reason for the meeting, Agents believe BARNES was aware that ADKINS may have contacted him to seek assistance as a result of BARNES' solicitation in February 2017, and that BARNES was trying to further obstruct any investigation into BARNES pursuant to the solicitation attempt on ADKINS. Therefore, agents believe BARNES was, with his attempt to posit the reason for the meeting, attempting to cover his attempted bribe/solicitation and obstructive behavior specific to the ADKINS investigation.

### Adkins meets Barnes on May 30, 2018.

14. ADKINS and BARNES then met on May 30, 2018. During the May 30, 2018, consensually recorded conversation between ADKINS and BARNES, ADKINS, under the direction of the FBI, confronted BARNES about the $200,000 bribe solicitation that ADKINS claims BARNES made to him in February of 2017.

15. Several exchanges in the recorded interaction on May 30, 2018, support ADKINS' assertion that the $200,000 bribe solicitation indeed took place.

16. ADKINS told BARNES that ADKINS lied to the FBI about BARNES' attempt to solicit $200,000 from ADKINS to make his case go away, and that the two needed to be on the same page. In response, BARNES did not deny that the solicitation occurred. Rather, BARNES

6

said that he had no idea that anyone was looking into himself or his people on that matter. BARNES commented that, because ADKINS never took BARNES up on his offer, nothing transpired and nothing happened.

17. Later in the meeting, ADKINS confronted BARNES again about the solicitation and said, "See, when you come here and told me about that, about the $200,000, and I didn't hear from you anymore, then I thought… " BARNES then changed the subject about when and where the two last met, but he again did not deny the solicitation occurred.

18. At one point in the meeting on May 30, 2018, when ADKINS again revisited the $200,000 solicitation, ADKINS told BARNES he wished he would have taken BARNES up on his offer. BARNES responded as follows: "Yeah, well, I don't know if the guys, uh, could have helped you out with anything. You know what I mean, it takes time, it takes resources to be able to listen to what's going on, you know what I mean, to see, uh, this or that, you know?" ADKINS then asked BARNES if he had taken him up on his offer, would it have helped ADKINS' current situation. Barnes responded, "Well, in life, it seems the person with the most information is the winner." Later in responding to ADKINS' question, BARNES said, "Nothing was ever pursued anymore, nothing was ever said, it just was the fact that, uh, there were some things that could [have] happened—it was there, just some scuttlebutt. . . . But to move forward, it takes fuel, it takes ammo . . . ." ADKINS interrupted, "It takes money." BARNES replied, "Exactly right." BARNES then said, "I think the last time we spoke, you were going to get back with me, then I never heard from you." This is one of many examples of when ADKINS brought up the solicitation and BARNES never denied that it occurred and even continued to minimize the solicitation.

7

19.     At another point during the in-person meeting between ADKINS and BARNES, ADKINS asked BARNES again about the $200,000 solicitation made by BARNES, at which point BARNES made subtle admissions the solicitation occurred. ADKINS asked, "Was they [referencing BARNES' connections involved in the bribe solicitation] the ones wanting the 200 [referencing the $200,000], or was that you?" BARNES responded, "No, no, I just uh… wasn't anything to do with me…" ADKINS then asked BARNES whether BARNES "just made the offer." BARNES did not deny the offer occurred, rather he continued his previous answer saying, "Wasn't anything to do with me at all." BARNES continued his rationalization of this line of questioning by asking ADKINS how the "Feds" would have come to ask specific question of ADKINS about "something like that," meaning the $200,000 solicitation.

20.     At one point in the May 30, 2018, meeting between ADKINS and BARNES, ADKINS again brought up the solicitation saying, "I should have done it back then." BARNES responded saying, "Well, like I said, you never know what you was going to do, or what you're not going to do, or how anything was going to go, or whatever, whatever would have come out of it. You don't know, it's just like manure; they were going to throw it out there and see what grows. You know? It's just as simple as that. Nothing was guaranteed. Looking back out at it now, it's probably something you would have thought more of seriously." Agents believe in this exchange BARNES was acknowledging that if ADKINS had paid the $200,000, ADKINS may not be in the current situation he is in.

21.     At another point in the May 30, 2018 meeting, ADKINS asked BARNES if the $200,000 BARNES solicited from ADKINS for would have been paid to BARNES in cash. Specifically, ADKINS asked BARNES, "Like the deal you offered for the 200 [$200,000], that would have been in cash, right? They [referencing BARNES' connections involved in the bribe

8

solicitation] wanted it in cash?" BARNES acknowledged this, saying, "They was looking to cash on that. Yeah. Yeah." Agents believe in this exchange that BARNES was again acknowledging the past solicitation of $200,000.

22. Moreover, BARNES was instructed to provide law enforcement the details of all material information regarding the meeting. Despite this fact, in a meeting with law enforcement following BARNES' and ADKINS' interaction on May 30, 2018, BARNES did not reveal to agents that ADKINS questioned him about the $200,000.

### Adkins identifies facts specific to Barnes' untasked meeting at Adkins' home; Barnes later unwittingly acknowledges additional facts as to the untasked meeting.

23. During one of ADKINS' proffers with law enforcement following the search of his house, ADKINS described the circumstances leading up to the encounter he had with BARNES in February 2017 when the $200,000 solicitation occurred. ADKINS recalled that BARNES showed up unannounced during this particular visit, and that BARNES drove through the gate in front of ADKINS' driveway and up to ADKINS' house while the gate was open. Upon reaching the house, ADKINS recalled BARNES first encountered ADKINS' landscaper who then called ADKINS to inform him that BARNES was there. BARNES was admitted onto ADKINS' property. Upon first talking with ADKINS, BARNES stated to ADKINS the two needed to talk somewhere private; they went into ADKINS' detached garage. This is where BARNES wrote on a notepad that ADKINS was under investigation by the FBI and that BARNES had someone close who can stop the case for $200,000.

24. At a later date, specifically during the meeting between BARNES and ADKINS on May 30, 2018, BARNES unwittingly confirmed that he had spoken to the gardener on the day he approached ADKINS about the $200,000 solicitation. Agents then listened to an audio recording from when BARNES was tasked to meet with ADKINS on November 22, 2016, at

ADKINS home. At no point in the recording did agents hear BARNES encounter ADKINS' gardener/landscaper.

25. Thus, agents believe BARNES unwittingly corroborated a key fact laid out by ADKINS specific to the untasked visit by BARNES—namely, that BARNES encountered ADKINS' landscaper as he came onto ADKINS' property at the untasked visit in February 2017. Agents further believe this fact is key because agents believe, based on the recording of the visit during November 2016, that BARNES did not encounter ADKINS' landscaper as he came onto ADKINS' property for the tasked visit on November 22, 2016.

### After the meeting with Adkins on May 30, 2018, Barnes confers with law enforcement agents on May 30 and 31, 2018.

26. After the meeting with ADKINS on May 30, 2018, BARNES met with agents the same day to discuss BARNES' meeting with ADKINS on May 30, 2018. BARNES never revealed to agents that ADKINS challenged him about the $200,000 solicitation attempt to make the FBI case go away, nor did BARNES admit that there was a second meeting with ADKINS at ADKINS' home in late February 2017. BARNES also failed to mention other material aspects of his interactions with ADKINS on May 30, 2018. Notable examples of what BARNES failed to disclose to law enforcement regarding the meeting on May 30, 2018, include: that BARNES directed ADKINS to give up "the big things" in ADKINS' fraud case; despite directing ADKINS to give up "the big things" in ADKINS' fraud case, BARNES also directed ADKINS that he should not mention BARNES to agents or investigators. This behavior is further indicative of BARNES' obstructive conduct during this case.

27. BARNES then spoke with agents again the next day, on May 31, 2018, in a consensually recorded phone call. BARNES continued to engage in obstructive behavior on May 31, 2018, when he spoke to law enforcement. For example, BARNES failed to mention he

10

tried to solicit a $200,000 payment from ADKINS in February 2017. BARNES also fabricated a story to agents that BARNES purposefully made ADKINS believe BARNES had government contacts with access to information to further the ADKINS investigation. BARNES told agents more details about his mention to ADKINS of government agents associated with BARNES' mob contacts in northern Ohio who can run databases and find things out for ADKINS. As was previously mentioned, agents in the ADKINS case were not aware that, according to what BARNES represented to law enforcement on May 31, 2018, BARNES previously told ADKINS that BARNES had access to individuals who can run databases in the federal government. Such actions by BARNES, if taken, would not have served the goals of the investigation into ADKINS at the time BARNES was involved.

28. Therefore, based on the foregoing, your affiant has probable cause to believe that cell tower records for the TARGET PHONE, 740-319-7993, will reveal BARNES went to ADKINS' home in late February 2017, unbeknownst to the FBI, as further evidence that, in February 2017, BARNES attempted to solicit $200,000 from ADKINS in exchange for making ADKINS' FBI investigation "go away" in late February 2017 and assisting in the obstruction investigation.

29. Records from Sprint revealed that, as of February 22, 2017, the cellular telephone number of 740-319-7993, the TARGET PHONE, is most recently subscribed to by Global, LLC, 7652 Sawmill Road Suite 192 Dublin, Ohio 43016. Past subscribers have included: Global Striping; Eco Logical Solutions, LLC; Mid-Ohio Painting Services; Gregory Barnes, LLC; and Barnes Services LLC. Agents have known all of the above entities to be associated with BARNES and the TARGET PHONE, which dates back to March 14, 2001, and continues through the present.

30. Based on this information, and on my training and experience, cell phones can be used to track the current location of fugitives, witnesses or victims of crimes. In addition, the records that cell phones produce can assist in determining whether or not a subject, witness or victim was at the scene of a crime. I believe the information sought in the attached application will assist in the investigation, generate leads, identify witnesses, or help determine whether or not certain subjects were involved in this particular crime and if BARNES was did in fact engage in an unauthorized meeting with ADKINS in early 2017.

31. In my training and experience, I have learned that **Sprint** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

32. Based on my training and experience, I know that **Sprint** can collect information about the location(s) of the TARGET PHONE. I also know that wireless providers such as **Sprint** typically collect and retain location information pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

33. Based on my training and experience, I know that wireless providers such as **Sprint** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as **Sprint** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

34. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

35. I further request that the Court direct **Sprint** to disclose to the government any information described in Section I of Attachment B that is within **Sprint's** possession, custody, or control. Because the warrant will be served on **Sprint**, who will then compile the requested

records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

36. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

Respectfully submitted,

_____
Michael A. Harey
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on July 16, 2018

_____
ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **740-319-7993, with ESN/MSN 089471027907694104, IMSI 310120135845823, and MSID 7065013768** ("the Account"), that are stored at premises controlled by **Sprint ("the Provider")**, headquartered at 6480 Sprint Pkwy Overland Park, Kansas 66251.

## ATTACHMENT B

### Particular Things to be Seized

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period of **November 1, 2016, to present:**

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Historical call detail records with cell site and sector information;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment

Identities ("IMEI"), NELOS records from AT&T, RTT records from Verizon PCMD records from Sprint;

  vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

  viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

 b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

  i.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

  ii.  information regarding the cell towers and sectors through which the communications were sent and received; and

  iii.  any other information about the location from which the communications were sent and received, including all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, instrumentalities, and proceeds of violations of **18 U.S.C. §§ 1503 and 1512** involving Greg Barnes during the period of **November 1, 2016, through present.**